The UNITED STATES for the Use and Benefit of CONVEYOR RENTAL & SALES COMPANY, Plaintiff–Appellant,

v.

AETNA CASUALTY & SURETY COMPANY, Defendant–Appellee.

No. 91–16225.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1992.

Decided Dec. 10, 1992.

William F. Haug, Julianne C. Wheeler, Jennings, Kepner & Haug, Phoenix, AZ, for plaintiff-appellant.

Roger E. Brodman, Gallagher & Kennedy, Phoenix, AZ, for defendant-appellee.

Before POOLE, FERNANDEZ, and T.G. NELSON, Circuit Judges.

T.G. NELSON, Circuit Judge:

The United States for the use and benefit of Conveyor Rental & Sales Company ("Conveyor Rental") appeals the district court's grant of summary judgment in favor of Aetna Casualty & Surety Company ("Aetna") in a Miller Act action, pursuant to 40 U.S.C. § 270a–270d. Conveyor Rental seeks payment from Aetna, the surety for government contractor Ed Waln Construction Company ("Ed Waln"), for equipment rented by the San Carlos Apache Tribal Utility Authority ("the Tribe"), which had contracted with Ed Waln to furnish crushed rock to facilitate Waln's completion of his government contract. This action arises from the Tribe's refusal to pay Conveyor Rental after Ed Waln filed for bankruptcy. We have jurisdiction pursuant to 28 U.S.C. § 1291 and AFFIRM.

## STATEMENT OF FACTS

Ed Waln Construction Company was hired by the Bureau of Indian Affairs ("BIA") to construct a road (the Point of Pines Road Project) and a bridge (the San Carlos Bridge Project). Pursuant to the Miller Act, which requires a government contractor to post a surety bond to protect those who supply labor or materials on a

federal project, Ed Waln posted bond, with Aetna as surety.

Ed Waln entered into a contract with the Tribe to purchase crushed rock necessary to complete both projects. The purchase order indicated that the Tribe was to crush and stockpile aggregate base course and mineral aggregate per BIA specifications. The purchase order also provided that (1) Ed Waln's lab technician would aid the Tribe in quality control by sampling the crushing production; (2) the crushed rock was to be picked up from the Tribe and hauled to the construction sites by Ed Waln; (3) payment was to be made as Ed Waln was paid by the BIA; and, (4) the Tribe had full responsibility for producing acceptable material. The Tribe, in turn, entered into a rental contract with Appellant Conveyor Rental for rock crushing equipment.

On August 7, 1988, Ed Waln filed for bankruptcy. On August 29, 1989, the Tribe informed Conveyor Rental that because Ed Waln did not pay the Tribe in full, the Tribe would not pay the amount due on the rental agreement with Conveyor Rental.

On June 22, 1990, Conveyor Rental filed a Miller Act claim against Aetna, as Ed Waln's surety, seeking payment from the protection bond. The Tribe, declining to waive its sovereign immunity against suit, was not a defendant in the action. On January 30, 1991, Conveyor Rental filed a motion for summary judgment, and on March 5, 1991, Aetna filed a cross-motion for summary judgement. On May 20, 1991, the district court issued a Memorandum Order and separate Judgment granting Aetna's cross-motion.

On June 3, 1991, Conveyor Rental moved for a new trial which was denied on July 10, 1991. Conveyor Rental timely appeals the Judgment and the district court's denial of its Motion for a New Trial. We AFFIRM the district court's decision.

## STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 629 (9th Cir.1987). The parties in the present case agree that there are no genuine issues of material fact which preclude summary judgment.

## DISCUSSION

"The Miller Act, 40 U.S.C. § 270a *et seq.*, requires a prime contractor of a federal project to furnish a payment bond to insure payment to individuals who supply labor and/or materials for federal projects." *United States for Use and Benefit of Consol. Pipe & Supply Co. v. Morrison–Knudson Co.*, 687 F.2d 129, 131 (6th Cir.1982). The Act was designed as an alternative remedy to the mechanic's lien available in ordinary private construction disputes because a lien cannot attach to government property. *F.D. Rich Co. v. United States for the Use of Indust. Lumber Co.*, 417 U.S. 116, 122, 94 S.Ct. 2157, 2161, 40 L.Ed.2d 703 (1974). Although the Miller Act is to be construed liberally, it is limited by a proviso that the payment bond protects only those persons who have a contractual agreement with a prime contractor or subcontractor engaged in a federal project. *Id.* (citing 40 U.S.C. § 270b(a)). Persons supplying labor or material to a mere materialman are not protected. *Id.*

Because Conveyor Rental had a contractual agreement with the Tribe, Conveyor Rental is entitled to protection under the Miller Act only if the Tribe were a subcontractor on the federal project. Conversely, if the Tribe were merely a materialman, Conveyor Rental cannot assert a Miller Act claim. Thus, the sole issue in this case is whether the Tribe was a subcontractor or a materialman on the federal project.

### A. Definition of Subcontractor

The Supreme Court defined a subcontractor as "one who performs for and takes from the prime contractor a specific part of the labor or material requirements of the original contract." *MacEvoy Co. v. United States for the Use of Calvin Tomkins Co.*, 322 U.S. 102, 109, 64 S.Ct. 890, 894, 88 L.Ed. 1163 (1944). The test for

whether one is a subcontractor is based on the "substantiality and importance of his relationship with the prime contractor." *F.D. Rich*, 417 U.S. at 123, 94 S.Ct. at 2162. The Court reasoned,

> It is the substantiality of the relationship which will usually determine whether the prime contractor can protect himself, since he can easily require bond security or other protection from those few "subcontractors" with whom he has a substantial relationship in the performance of the contract.... [Whereas] this method of protection is generally inadequate to cope with remote and undeterminable liabilities incurred by an ordinary materialman.

*Id.* at 123–24, 94 S.Ct. at 2162 (quoting *MacEvoy*, 322 U.S. at 110, 64 S.Ct. at 895).

**B. *Test to Distinguish Subcontractor and Materialman***

■ In distinguishing a subcontractor from a materialman, courts apply a balancing test with certain factors tending to weigh in favor of a subcontractor relationship, particularly where the company as-sumed a significant and definable part of the construction project, and other factors tending to weigh in favor of a materialman relationship.

Generally, courts have found the following factors weigh in favor of a subcontractor relationship: (1) the product supplied is custom fabricated[1]; (2) the product supplied is a complex integrated system[2]; (3) a close financial interrelationship exists between the companies[3]; (4) a continuing relationship exists with the prime contractor as evidenced by the requirement of shop drawing approval by prime contractor[4] or the requirement that the supplier's representative be on the job site[5]; (5) the supplier is required to perform on site[6]; (6) there is a contract for labor in addition to materials[7]; (7) the term "subcontractor" is used in the agreement[8]; (8) the materials supplied do not come from existing inventory[9]; (9) the supplier's contract constitutes a substantial portion of the prime contract[10]; (10) the supplier is required to furnish *all* the material of a particular type[11]; (11) the

1. See *Miller Equip. Co. v. Colonial Steel & Iron Co.*, 383 F.2d 669, 674 (4th Cir.1967), *cert. denied*, 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968); *United States for the Use of Wellman Eng'g Co. v. MSI Corp.*, 350 F.2d 285, 287 (2d Cir.1965) (mechanism built to prime contract specifications for unique task); *but see Aetna Casualty & Sur. Co. v. United States for the Use of Gibson Steel Co.*, 382 F.2d 615, 617 (5th Cir.1967) (custom manufacturing not enough to establish a relationship of responsibility and importance); *United States for the Use of Pioneer Steel Co. v. Ellis Constr. Co., Inc.*, 398 F.Supp. 719, 721 (E.D.Tenn.1975) (same); *Brown & Root, Inc. v. Gifford–Hill & Co.*, 319 F.2d 65, 66 (5th Cir.1963); *United States for the Use of Bryant v. Lembke Constr. Co.*, 370 F.2d 293, 296 (10th Cir.1966) (specifications in prime contract "merely descriptive of what was to be furnished"); *United States for the Use of Potomac Rigging Co. v. Wright Contracting Co.*, 194 F.Supp. 444, 447 (D.Md.1961) (specifications description is necessary whether the supplier is a subcontractor or only a material supplier).

2. *Gibson*, 382 F.2d at 618.

3. See *F.D. Rich*, 417 U.S. at 124, 94 S.Ct. at 2162; *Basich Bros. Constr. Co. v. United States for Use of Turner*, 159 F.2d 182, 183 (9th Cir.1946); *F.D. Rich Co. v. United States for the Use of Indust. Lumber Co.*, 473 F.2d 720, 724 (9th Cir.1973) ("Rich I"), *affirmed in part and remanded on other grounds*, 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974).

4. *Morrison–Knudson*, 687 F.2d at 135; *United States for the Use and Benefit of Clark v. Lloyd T. Moon, Inc.*, 698 F.Supp. 665, 667 (S.D.Miss. 1988); *Pioneer Steel*, 398 F.Supp. at 721.

5. *Morrison–Knudson*, 687 F.2d at 135; *Pioneer Steel*, 398 F.Supp. at 721.

6. *Gibson*, 382 F.2d at 618; *Moon*, 698 F.Supp. at 667.

7. *Travelers Indem. Co. v. United States for the Use and Benefit of W. Steel Co.*, 362 F.2d 896, 898 (9th Cir.1966).

8. *Morrison–Knudson*, 687 F.2d at 134 (terms of agreement warrant only *de minimis* consideration); *Lembke*, 370 F.2d at 296.

9. *Morrison–Knudson*, 687 F.2d at 134; *Pioneer Steel*, 398 F.Supp. at 721.

10. *Morrison–Knudson*, 687 F.2d at 135 n. 3 (2.5% total construction cost); *Miller Equipment*, 383 F.2d at 674 (15% of prime contract); *Moon*, 698 F.Supp. at 668 (substantial percentage of materials used in entire project).

11. *Basich*, 159 F.2d at 183; *Lembke*, 370 F.2d at 295–96; *Moon*, 698 F.Supp. at 667.

supplier is required to post performance bond [12]; (12) there is a backcharge for cost of correcting supplier's mistakes [13]; and (13) there is system of progressive or proportionate fee payment [14].

Generally, cases have found the following factors tend to weigh in favor of a materialman relationship: (1) a purchase order form is used by the parties [15]; (2) the materials come from preexisting inventory [16]; (3) the item supplied is relatively simple in nature [17]; (4) the contract is a small percentage of the total construction cost [18]; and (5) sales tax is included in the contract price.[19]

## C. *Factors Applied to the Present Case*

### 1. Custom Fabrication

█ Conveyor Rental argues that a subcontractor relationship existed between Ed Waln and the Tribe in part because the Tribe was required to custom fabricate the gravel to meet the specifications in the prime contract.

Evidence to support this claim is Ed Kelton's affidavit stating that he was hired by the Tribe to design, mobilize, supervise, and act as foreman of the operation, which included deciding what measures were necessary to bring the material into compliance with the prime contract specifications. Supplemental evidence supporting this claim was presented in Conveyor Rental's Motion for a New Trial showing that the

Tribe was required to select rock which, when crushed, would not exceed a plasticity index of 6.[20] To meet those specifications, the Tribe had to crush the rock and then screen it to produce gravel which met the size requirements.

We find that the custom specifications in the present case are more like the custom specifications in cases finding a materialman relationship. In *Aetna Casualty & Surety Co. v. United States for the Use of Gibson Steel Co.*, the Fifth Circuit found that the custom manufacturing of some steel and iron products used in a building "is simply not enough in itself to establish the relationship of responsibility and importance necessary to render a middle party a subcontractor." 382 F.2d 615, 617 (5th Cir. 1967); *accord United States for the Use of Pioneer Steel Co. v. Ellis Constr. Co.*, 398 F.Supp. 719, 721 (E.D.Tenn.1975) (custom fabrication of trusses and pipebridges for building not enough to establish subcontractor relationship); *see Brown & Root, Inc. v. Gifford–Hill & Co.*, 319 F.2d 65, 66 (5th Cir.1963) (involving sand and gravel specifications). The Tenth Circuit, in *United States for the Use of Bryant v. Lembke Construction Co.*, found a materialman relationship in circumstances where the specifications for concrete in the prime contract were "merely descriptive of what was to be furnished." 370 F.2d 293, 296 (10th Cir. 1966); *accord United States for the Use of*

---

12. *Morrison–Knudson*, 687 F.2d at 135; *Moon*, 698 F.Supp. at 667; *Potomac Rigging*, 194 F.Supp. at 448; *Pioneer Steel*, 398 F.Supp. at 721.

13. *Gibson*, 382 F.2d at 618; *Moon*, 698 F.Supp. at 667.

14. *Gibson*, 382 F.2d at 618; *Potomac Rigging*, 194 F.Supp. at 447–48.

15. *Miller Equip.*, 383 F.2d at 674; *Potomac Rigging*, 194 F.Supp. at 447.

16. *Gibson*, 382 F.2d at 618; *Moon*, 698 F.Supp. at 667.

17. *Gibson*, 382 F.2d at 618; *Moon*, 698 F.Supp. at 668.

18. *Gibson*, 382 F.2d at 618 (2% of total construction cost); *Pioneer Steel*, 398 F.Supp. at 721 (9% of total construction cost).

19. *Gibson*, 382 F.2d at 618; *Pioneer Steel*, 398 F.Supp. at 721; *Moon*, 698 F.Supp. at 667; *Potomac Rigging*, 194 F.Supp. at 447.

20. Aetna argues that this court may not consider evidence that was not before the district court at the time of its summary judgment ruling. Because Conveyor Rental appeals both the district court's summary judgment order and the district court's order denying Conveyor Rental's Motion for a New Trial, evidence before the district court with regard to the latter motion may be considered in this appeal, albeit under a more stringent standard of review. *See Browning–Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 278, 109 S.Ct. 2909, 2921, 106 L.Ed.2d 219 (1989) (a district court's decision concerning a motion for a new trial pursuant to Fed.R.Civ.P. 59 is reviewed for an abuse of discretion).

*Potomac Rigging Co. v. Wright Contracting Co.,* 194 F.Supp. 444, 447 (D.Md.1961) (descriptive specifications for cribbing in retaining wall were "necessary whether the supplier is a subcontractor or only a material supplier").

The specifications here, which appear to be merely descriptive of what was to be furnished, are similar to the relatively uncomplicated specifications for steel products required for a building (*Gibson*), trusses and pipebridges for a building (*Pioneer Steel*), sand and gravel for navigation locks (*Brown & Root*), concrete for buildings (*Lembke*) and cribbing for retaining walls (*Potomac Rigging*). The BIA specifications in the present case were "necessary whether the supplier is a subcontractor or only a material supplier." *Potomac Rigging,* 194 F.Supp. at 447.

The two cases which found a subcontractor relationship are distinguishable from the present case because they involved highly intricate customized fabrication. In *Miller Equipment Co. v. Colonial Steel & Iron Co.,* the "agreement called not for the mere supply of material but for the custom fabrication of massive girders and their accessories, key and integral components of the bridge, designed and fabricated to mesh precisely in their final assembly on the job-site." 383 F.2d 669, 674 (4th Cir. 1967). And in *United States for the Use of Wellman Engineering v. MSI Corp.,* the "[m]echanism [was] built to the prime contract specifications, for the unique task of rapid movement of the heavy concrete roofs of missile launchers...." 350 F.2d 285, 287 (2d Cir.1965), *cert. denied,* 390 U.S. 955, 88 S.Ct. 1049, 19 L.Ed.2d 1148 (1968).

We conclude, therefore, this factor tends to support a materialman relationship given the relatively simple requirements of the BIA specifications.

### 2. Continuing Relationship With Prime Contractor

Courts have found that a continuing relationship between the supplier and the prime contractor could be indicative of a "substantial and important" subcontractor relationship. For example, this factor has weighed in favor of such a relationship where there is a close financial interrelationship between the companies[21], a requirement of shop drawing approval by prime contractor[22] or requirement that supplier's representative be on the job site[23].

In the present case there is no evidence of a close financial relationship between Ed Waln and the Tribe nor was a Tribe representative required on site. Although Ed Waln did provide a lab technician to test the gravel, this relationship was not as ongoing or symbiotic as those in the above cases. Moreover, the fact that Ed Waln checked the compliance with specifications may show less than a complete transfer of the responsibility for this part of the contract to the Tribe. Therefore, this factor weighs in favor of a materialman relationship.

### 3. On Site Performance

The on-site performance of the supplier has been regarded as a factor in support of a subcontractor relationship by the Ninth Circuit. *See Basich Bros. Constr. Co. v. United States for Use of Turner,* 159 F.2d 182, 183 (9th Cir.1946) (subcontractor supplier delivered material to prime contractor at plant site); *see also Moon,* 698 F.Supp. at 667 (materialman supplier did no on-site work); *but see Wellman,* 350 F.2d at 286 (Second Circuit holding that definition of subcontractor not limited to only on-site performers). In the present case, this factor weighs in favor of a materialman relationship because the Tribe did not perform on site.

**21.** *See F.D. Rich,* 417 U.S. at 124, 94 S.Ct. at 2162; *Basich,* 159 F.2d at 183.

**22.** *Morrison–Knudson,* 687 F.2d at 135; *Moon,* 698 F.Supp. at 667; *Pioneer Steel,* 398 F.Supp. at 721.

**23.** *Morrison–Knudson,* 687 F.2d at 135; *Pioneer Steel,* 398 F.Supp. at 721.

#### 4. Terms of the Agreement

In accordance with all the cases addressing this issue, we afford only *de minimus* consideration to the fact that the agreement between Ed Waln and the Tribe was a purchase order rather than a subcontract. *See Morrison–Knudson,* 687 F.2d at 134 ("the presence or absence of [the term subcontractor] in the contractual agreement between the prime contractor and the middle party is not controlling of the 'subcontractor' issue"); *Miller Equip.,* 383 F.2d at 674 (it is unimportant that the agreement was designated as a purchase order); *Lembke,* 370 F.2d at 296 (meaning of subcontractor is not dependent upon how the parties designate themselves). However, the *de minimus* consideration weighs in favor of materialman status.

#### 5. Non–Inventory Materials

■ Courts have found supplying non-inventory materials to be a factor supporting a subcontractor relationship [24] and, conversely, supplying preexisting inventory to be a factor supporting a materialman relationship.[25]

Aetna presented the affidavit of Albert C. Ruckman, an engineer employed by a competing construction company, to support its argument that the Tribe supplied preexisting inventory to Ed Waln.[26]

We agree with Conveyor Rental that Mr. Ruttman's statement is inadmissible under Fed.R.Evid. 602 and Fed.R.Civ.P. 56(e) for lack of requisite personal knowledge. Accordingly, there is no evidence in the record to support Aetna's preexisting inventory argument.

#### 6. Proportionate Responsibility for the Prime Contract

In determining whether there is a "substantial and important" relationship between the companies, courts also look at the secondary contract's percentage of the prime contract. Here the Tribe furnished all the gravel for the projects and the secondary contract's percentage of the prime contract ranges from five to nine percent (depending upon various factors contested by the parties).

While all courts agree proportionate responsibility is an important factor, there is no consensus in their interpretation of figures. For example, the percentage of the prime contract in courts finding a subcontractor relationship has ranged from 2.5%, *Morrison–Knudson,* 687 F.2d at 135 n. 3, to 15%, *Miller Equip.,* 383 F.2d at 674. And the percentage of the prime contract in courts finding a materialman relationship has ranged from 2%, *Gibson,* 382 F.2d at 618, through 5.15%, *Moon,* 698 F.Supp. at 668, to 9%, *Pioneer Steel,* 398 F.Supp. at 721.

Although the Tribe furnished all the gravel for the project, *see, e.g., Basich,* 159 F.2d at 183, we find, even at a percentage figure most favorable to Conveyor Rental, that the percentage of the prime contract is indicative of a materialman relationship. This conclusion is based in part on the fact that nine percent overstates the importance of the gravel to the whole project considering the amount of work that had to be done to the gravel by other people for the road project to be completed.

#### 7. Form of Payment

Courts have found that suppliers receiving progress payments or proportionate payments are more likely to be subcontractors, while suppliers receiving fixed payment (e.g., payment within ninety days) are more likely to be materialmen. *Gibson,* 382 F.2d at 618; *Potomac Rigging,* 194 F.Supp. at 447–48.

This factor weighs on the subcontractor side because the contract between Ed Waln

---

**24.** *Morrison–Knudson,* 687 F.2d at 134; *Pioneer Steel,* 398 F.Supp. at 721.

**25.** *Gibson,* 382 F.2d at 618; *Moon,* 698 F.Supp. at 667.

**26.** Mr. Ruckman, who worked for Corn Construction Company, stated, "I understand that the Triplett Pit was used by Corn Construction Company on a previous BIA paving job several years ago. I am aware that some of the leftover material produced from the Corn Construction job was used on [the road project]."

and the Tribe provided for progress payments.

### 8. Other Factors

Aetna and/or the district court considered the following additional factors not raised by other courts.

#### a. *Uniqueness of Materials*

The district court found that the Tribe's product was not substantial and important to the completion of the prime contract because, *inter alia*, the Tribe's product was interchangeable with products of other suppliers and the general contractor could readily find another supplier.

■ No court has adopted a uniqueness or interchangeability requirement to support a subcontractor relationship, and we decline to do so now. Such a requirement would contradict Supreme Court and Ninth Circuit cases that have found subcontractor relationships where materials were not unique. *See, e.g., F.D. Rich,* 417 U.S. at 119, 94 S.Ct. at 2160 (plywood and millwork); *Basich,* 159 F.2d at 183 (gravel); *Travelers Indem. Co. v. United States for the Use and Benefit of Western Steel Co.,* 362 F.2d 896 (9th Cir.1966) (structural steel); *see also Morrison–Knudson,* 687 F.2d at 130 (fabricated pipe); *Moon,* 698 F.Supp. at 665 (structural steel). The Miller Act would be at least partially dismantled if the uniqueness of the work or material supplied to federal projects had to be established before a subcontractor's supplier could recover.

#### b. *The Tribe's Payroll Practices (Bacon–Davis Act)*

Aetna argues that the Tribe was not a subcontractor because it did not pay wages pursuant to the Bacon–Davis Act, which governs the salary of subcontractors' employees on federal projects.

The only evidence of the Tribe's payroll practices is contained in the affidavit of James L. Combs, vice president of JWJ Contracting Company, a subcontractor that later assumed Ed Waln's contract and finished the Point of Pines Road Project. Mr. Combs stated he had personal knowledge that: "The Tribe did not comply with the Davis–Bacon Act which covers contractors and subcontractors performing work on a Federal Government project. At no time did the Tribe submit certified payrolls to the government to show compliance with Davis–Bacon."

This evidence is inadmissible under Fed. R.Evid. 602 and Fed.R.Civ.P. 56(e) for failure to establish Mr. Combs' personal knowledge as to what payroll documents the Tribe submitted to the Government. Therefore, there is no evidence in the record to support Aetna's allegations.

#### c. *Intent to Use Facility For Future Projects*

Aetna claims the Tribe must be a materialman because it "intended to use Conveyor Rental's equipment to produce crushed rock on other BIA projects." Aetna makes no cognizable legal argument, failing to explain how the Tribe's intended use of the rental equipment after the project is completed has anything to do with the nature of the Tribe's relationship with Ed Waln.

### 9. Basich Bros. Distinguished

Conveyor Rental argues that the district court erred in failing to follow *Basich Bros. Constr. Co. v. United States for Use of Turner,* 159 F.2d 182 (9th Cir.1946), a Ninth Circuit case which found a subcontractor relationship existed in a factual scenario somewhat similar to the present case.

While it is true that, like the Tribe, the subcontractor in *Basich Bros.* produced all the gravel, rock and sand required for a road project in accordance with government specifications, other factors tend to show a closer interrelationship between that case's prime contractor and subcontractor than exists in the present case. Unlike the present case, the prime contractor in *Basich Bros.:* made arrangements to secure the subcontractor's worksite; paid for the rental of the subcontractor's worksite; maintained and operated the subcontractor's plants; paid the subcontractor's labor payroll; and entered into a contract with the subcontractor which provided for

the renegotiation of the prices of "subcontracts". 159 F.2d at 183. Consequently, the *Basich Bros.* holding does not control the present case.

## CONCLUSION

As the foregoing analysis indicates, the factors overwhelmingly balance in favor of a materialman relationship between the Tribe and Ed Waln: there was no significant custom fabrication because the specifications in the prime contract were merely descriptive of what was to be furnished; there was no continuing relationship between the Tribe and the prime contractor; the Tribe did not perform on site; the Tribe's contract constituted only a small proportion of the prime contract; and, the agreement between Ed Waln and the Tribe was on a purchase form, not a subcontract. The only factor tending to show a subcontractor relationship was Ed Waln's progressive, rather than fixed, form of payment to the Tribe.

The district court did not err in granting Aetna's Cross Motion for Summary Judgment or in denying Conveyor Rental's Motion for a New Trial.

AFFIRMED.